Good morning, Your Honors. Ryan Andrews for Peter Deacon. I'd like to reserve three minutes for rebuttal. Thank you. The District Court's dismissal of Mr. Deacon's complaint, finding that Michigan's Video Rental Privacy Act just doesn't apply to Pandora, should be reversed. There are three primary reasons for this. First, this case involves a privacy statute that was written to prevent the disclosure of consumers' deeply personal choices in the books they read, in the movies they watch, and, as relevant today, in the music they listen to. And the Michigan legislature would clearly have intended the disclosures by Pandora to be covered by this statute. Are there any Michigan cases that construe this statute? Michigan State cases, I do not believe there are any. But we're talking about Michigan law, so any Michigan Supreme Court cases? The only — there are Michigan Supreme Court decisions that deal with consumer protection laws generally, and those cases say that — Yeah. How about this statute? There are none, Your Honors. Any other Michigan appellate cases that deal with this statute? There are none. Is there any reason we shouldn't certify this question to the Michigan Supreme Court? We would not oppose certification, but I don't believe that certification under Michigan Court Rule 7.305B here is required, because there's really only one correct way to interpret that statute. Well, so you say, but the district court may have a different view of that. Well, let me ask you this. This statute was enacted back in the days following the situation that occurred with Judge Bork, where they got his video rental records. And as I understand it, there's a Federal statute that was passed around the same time? That's correct. The Federal Video Privacy Protection Act. And are there statutes in other States that were enacted at a similar time? Not that I'm aware of, Your Honor. These are the only two that I'm aware of. Okay. And the district court interpreted — used Federal law in order to assist in interpreting this statute. Is that correct? Can you explain how that was — how that was developed? They — the district court relied heavily, as Pandora does, on Federal copyright law, almost to the point of field preemption. You use definitions from copyright, terms from copyright. This case doesn't have anything to do with copyrights. What about the statute Judge Schroeder asked you about, the Federal video? That statute as well. That statute also should not — does not deal with Federal copyright issues. It deals with personal privacy issues, just like this statute does. It doesn't deal with audio recordings, does it? That statute does not deal with audio recordings. That statute is solely limited to videos, audiovisual — audiovisual material. The Michigan statute in that respect is broader in scope because it applies both to written materials, books, movies, and musical choices. And the Michigan statute deals with lending and borrowing, which is a difference from the Federal statute also, isn't it? The Federal statute doesn't envision borrowing or — Correct. That's also — that's also true. Let me get back to my first question. There really aren't any appellate cases anywhere, Federal or State, that deal with this particular statute. That's correct, Your Honor. Or the definition of the operative terms in the statute. That's correct. There are — this is a case in that — in that regard is a case of first impression. But this Court can decide that issue just like the Michigan Supreme Court could decide that issue because I think the language used is clear. It uses very commonly used terms, rent, lend, and borrow. Lend is to put at another's temporary disposal. It's also defined as to furnish or to impart. And if you look at how those terms are used in connection with digital media services today, it becomes all the more apparent that what Pandora is doing is — can be considered as renting or lending. They provide users with an actual copy of every song for a temporary period of time. That's lending. That's how an e-book is lent. That's how a digital movie is borrowed. And Pandora's music service, as alleged, is no different. The district court looked at those terms and said that it required either physical possession or return. Pandora, first, doesn't even defend that part of the holding here on appeal, because I think when you look at how modern libraries operate, how other digital movie and music services operate, that it's clear that the terms they use to describe their the district court's analysis, Netflix's streaming a movie isn't renting or lending, nor is Apple TV's, nor is Spotify. In fact, we have — there are defendants that are clearly renting movies online, claiming that this — that the district court's decision wholesale doesn't apply to anything that's streamed. It's a very dangerous precedent that basically guts the protections that were intended by this law. And instead, the district court and Pandora here on appeal focus on that something needs to be used or used in order to meet the definition of rent, lend, or borrow. First, you know, these are commonly used terms. There are lots of definitions of them. And only a few of those definitions even contain the sub — the term use, a sub-definition. The common meaning in this context of rent, lend, or borrow doesn't require any use. The court relied on volitional use, but that's just another term borrowed from copyright law. In copyright law, volitional use is how direct infringement is distinguished from secondary infringement. But even if use is required, use here can be an entirely passive activity, like listening to the music. The Supreme Court in Bailey v. The United States noticed or noted that use has several different meanings. It can be both active and passive conduct. The quote that the Supreme Court used was, I use a gun to protect my house, but I've never had to use it, invoking both the passive and active form of the term. But Mr. Deacon used the music provided by Pandora the exact same way that an e-book is used by someone who runs it from the San Francisco Public Library or an iTunes customer. They take temporary possession. And if they want, they can read it, they can listen, they can watch it to the movie. Or if it's an apartment, they can occupy the property. Or they cannot use it. They can let the borrowed property, you know, go vacant. They can let the e-book go unread. They can let the music play to an empty room. That doesn't stop the fact that it was rented, lended, or that it was borrowed. So what do you want us to do? Like you do find that as alleged in our complaint, that we stated a cause of action and we should do it. What happens? Are we – is there a – are there – is this on summary judgment, or what? No. We were dismissed on a Rule 12b motion. 12b6? Yeah. Largely because of the copyright issue. And I just want to emphasize that, as this Court is aware, copyright focuses on the protection of copyright holders. This Court need not look to cases defining it, and we need not get into whether Pandora's paying the proper amount of royalties under the Copyright Act to decide this issue. If there aren't any further questions, I'd like to reserve the remainder of my time. Sotomayor, so you see the principal error in what the district court did as its reliance on copyright law? That was one of the errors, but the Court also focused on this. And the definitional. Yes. It was all a definitional argument. And it was the possession and return, which isn't required in the digital media context, and it was this volitional use argument that it had to be actively used. And even if it was actively used, the record here shows that you can pause a Pandora song, you can skip a Pandora song. That's because you're getting an actual copy of the song. And more importantly, they're, you know, they're keeping records of that that can and were disclosed here. As you mentioned, back in, you know, 1988, when this statute was passed, that it applied to brick-and-mortar stores to start to end where we started, and that it didn't apply to broadcast radio, which Pandora tries to cast itself as, both in the district court and here on appeal. There's basically two problems with this. First, you know, this Court and other courts apply older laws to emerging technology all the time. This Court's decision in Satterfield v. Simon & Schuster, the Court applied a law written to, you know, stop spam faxes and robocalls to text messages, therefore, you know, protecting consumers nationwide. But second, Pandora might be like a broadcast radio station in some respects, but it's radically different for the purposes that matter here. For example, the radio in a 1988 Pontiac didn't know who you were, didn't know what radio stations you listened to, didn't provide actual copies of the music, and General Motors therefore couldn't take the records that it was keeping and provide them to others. Pandora did. Thank you. Thank you very much. Good morning. May it please the Court. Jacob Sommer from Pandora Media. The first question here is what is the scope of this statute? This doesn't cover the Michigan VRPA, does not cover every way we listen to music, watch movies, or read books. In 1988, it didn't apply to TV.  It didn't apply to concert halls. It didn't apply to theaters. It didn't apply to lecture halls. It only applies to businesses that rent, lend, or sell music. And this is important. It is a buy or borrow statute. The legislative history says buy or borrow. They're worried about what you buy or borrow. The text in the statute talks about buying, borrowing, lending. It doesn't talk about radio. It doesn't talk about streaming. The threshold question here is what is Pandora? Is Pandora just like the 1988 radio stations or television or something that performs music or is it renting or borrowing music? I think an analogy is probably helpful here. As opposed to using the new technology, I think about it in a different way using something very familiar. I think of Pandora a lot like a DJ. If you want to have music at a party or an event that you're throwing, you have a lot of different options. You can play your own music that you bought at a store. You might borrow a friend's music and play it. You can hire a DJ to come and play that music. The DJ comes to your house and the DJ brings CDs or records or maybe in this day and age, digital files. They play them at your house. They may even play them on your stereo. And while the DJ's there, you're paying the DJ. So you can tell the DJ, thumbs down, I don't want to hear that song. You can tell the DJ, thumbs up, everybody's really enjoying it, play more like this. And the DJ will. And I think under the common understanding of the term, nobody thinks that when the DJ comes to your house to play that music, you are borrowing their record collection. And so in this case, I look at the complaint because we're on a 12B6 motion. And paragraph 20 on the complaint tells us what sound recording it is that they think, that Peter Deacon thinks, is being, that he's borrowing. And that is a temporary song file that's put on his computer by Pandora for Pandora's use to facilitate its streaming. And why does it do that? It's just a version of... Right. Do we understand? Yeah, it places a file on the computer that's part of the stream of music that's coming to the user. And I think there's an important thing to note here. It's not like the user goes and picks a particular song, and that particular song gets downloaded to his computer, and then it's played. What happens is, the user is listening to a Pandora station. And as that station is playing, it downloads information down to the computer. It buffers. So what it's doing is... Based on a profile created by the user. Based on some suggestion the user gave. The complaint gives an example. We don't have to leave the complaint for this. The complaint says, you may put into Pandora, Paint It Black by the Rolling Stones. If you put Paint It Black by the Rolling Stones into Pandora, Pandora will play songs like that. Right. It's a profile. Yes. These are your likes, so to speak. Similar. Yes. And it listens to you, like a DJ at a party would listen to you and see what fills the floor or not. Let me go back to something that Mr. Andrews said. He said the district court, to some extent, in ruling in your client's favor, said, discussed the lack of physical possession and the lack of return. And he suggested, gratuitously, I think, that you had not argued those points. Are you abandoning the discussion that the district court relied on, to some extent? Absolutely not. So you're saying part of the analysis here, in defining these terms, is we have to have physical possession and we have to have return of the digital recording. Right. We have to have possession and return and use. I think possession and return is two sides of the same coin, and use is the second thing. You have to actually, when I say, do you want to borrow a CD, I expect that I'm going to hand that CD to you, you're going to use it, play it, or not, your choice, and then you're going to give it back to me at the end. That's what I understand in terms of- Theoretically different, though. I think it's a good analogy. Let's say I want to borrow your CD, right? You give it to me. What if you said, I'll pick it up at your house, leave it on the front door? So I get it from you, you deliver it to my house, I use it or don't use it, depending on whether I want to listen to it. I put it on the front door, where you left it, and you pick it up. Why isn't that a return? I think that can be a return, but there's still a specified period in which you have it. It's in your possession. And at the end, we can turn a different way, but I think here the issue is they are saying- Isn't that what lending is about? You have temporary possession of something. That's right. You have temporary possession of it, and you have the ability to use it. You have it. Here, I don't think the user actually has this file. The user is not allowed to do anything with it. The file is- Pandora still got it. Pandora has still got it. That's why I go back to the DJ example. It's like, no one thinks that you have the DJ's CDs. I mean, it's easier to use a physical object, we can see. No one thinks you have the DJ's CDs just because the DJ brought them to your house and is using to play them. They're in your house, just like this file's on your hard drive, but you're not the one using it. This isn't a file like you would think of, you know, I don't know, if you use iTunes and you download files. It's not a file you double-click and play in the iTunes store, and you play whenever you want and however you want. It's a buffering file. But you have a record of what has been, whatever word you want to use, but what has been permitted to be put on his player, right? We do, but I don't think that changes the statute. I think we have to stick to the statute's text here. The statute is not about, it's not a collection statute. It doesn't say everyone who collects information about these things is subject to the statute and anyone who happens to have a record. Lots of people keep records of, you know, your music listening other than borrowing and lending. If I go to a concert, for instance, and buy a concert ticket, they have a record of what I'm listening to because they know I bought the ticket. Speaking of sticking to the statute, this is the Michigan statute you're talking about, right? Yes, Your Honor. And in diversity jurisdiction cases, we're supposed to sit as if we were the Michigan court, right? Yes. No Michigan cases on this? No, the only Michigan cases on it are Michigan federal court cases, and they're all about the issue about whether or not there's statutory standing. Is this the only statute like this in the country? It's not. Well, it's the only statute that covers sound recordings. The VPPA covers video, although its definitions are different and its language is different. And I believe there's another statute in Connecticut that also covers video. But it's rare. It's a rarity. Keeping in mind that the Supreme Court has told us more than once we should be leery about opining on state law issues, I'm wondering why we shouldn't certify this case to the Michigan Supreme Court. I don't think this case needs certification because I think we can determine from the understanding of what these terms meant in 1988 and that they didn't apply to radio and they talk about buying and borrowing. Yeah, but who gets to say that? It's not you. I mean, it's the Michigan Supreme Court that is the, you know, expositor of Michigan law. Why shouldn't they get the first shot at this? I think they don't need to get the first shot at it because we can resolve it right here. And if we don't certify it, I'm trying to think, because of the quirks of federal diversity jurisdiction and removal jurisdiction, it seems like this would never get in front of the Michigan Supreme Court, would it? The Michigan courts would really never have an opportunity to pass on this statute because it would get removed to federal court. Well, not if it's brought as it probably should be brought, which is as an individual action in Michigan. Well, again, that's the way you see it. But, I mean, if the plaintiffs don't want to sue for 12 bucks in Michigan court, if they want to bring a class action or, you know, have a sufficient amount in controversy, there's really no way the Michigan court would ever pass on this. It would always likely get removed to federal court. If plaintiffs choose their forum and always choose a federal forum and always bring it as a class action and are always able to maintain a class action, yes, it would always be decided to let go. Or suppose they choose a state forum and there's diversity, you could remove it, right? We could. So it's very likely that the Michigan court would never even get a chance to pass on this. In the class action scenario, if they are alleging $5,000 in statutory damages, unless it is a very small class, I would have to agree that it would be very ---- it would most likely be resolved by a federal court. But that's what CAFA does. What does this have to do with federal law, with copyright law? I think that copyright law ---- I think that the appellant sort of overstates everyone's reliance on copyright law. I think that everything is clear before you even get to copyright law. The contract is clear, which we haven't talked about at all. The common sense is clear and the statutory text is clear. But copyright law is sort of a backstop. Because copyright decisions have thought a lot about whether or not Pandora is like traditional radio or whether it's a substitute for purchasing music. The case we submitted with our 28J letter this week is a long discussion about whether or not Pandora is more like traditional radio or like something else. And it finds that Pandora is very much like traditional radio because it is a passive form of listening. It's what they call lean-back listening in the industry, which means you say, I want to listen to something and then the music turns. You lean back and sit back and enjoy the music. Lean-forward listening is where you have to pick the songs. It's where you have to get your record collection out and play the music in the order you want to. So it's a passive form of listening. And what they say is it's not a substitute for buying music. And I think that that's what we're looking at here. If it's not a substitute for buying music, how does it fit under a statute that's about buying music or borrowing music and not about listening to music that someone else plays for you? So I think that copyright law informs that, but it's not necessary to the decision. You don't even have to talk about copyright law if you don't want to. So I think that if we look at this further, the next issue is this statute is a penal statute. And it does have a — it's a misdemeanor crime to violate it. I think to the extent there's ambiguity here, it should be interpreted narrowly. And I think it needs to be interpreted in this common-sense way where radio stations weren't covered in 1988. If this ephemeral sound recording is sitting — is not sitting on the computer, there's — I think even plaintiffs would — or appellant would admit they don't have a claim. And so I don't think we need to stretch the statute here and go way beyond it, especially when it's a penal statute, especially where it's got a misdemeanor. Roberts. On that thought, we should look at dictionary definitions. Do you agree? Because there's no definition of those terms in the statute itself. Absolutely. And I think everyone seems to be using the same dictionary definitions here. And they say that — and all of them talk about use. They talk about giving it over to someone else's possession for their use. How else do you use a digital recording other than turning on your computer when you choose to listen to the music, whether it's a layback or lean forward? I think that the way you use it is you have the ability to turn it on, listen to it when you want to, listen to it as many times as you want to. You can go forward, backwards. You can play the songs in any order you want to. You can go and you can select a particular song. And then you get it for a period, and you can do whatever you want with it. That's how you use the — That's one form of use, but why not turning on your computer to listen to Pandora on the profile music that you've chosen? Why isn't that a form of use? If that's use, Your Honor, I think that it's also use to turn on your radio and listen to the songs being played on the radio. But you don't have a profile. They don't know who you are. They don't know you turn on your radio. I don't know that that matters for the statute, whether or not they know. I don't understand, and the question is unanswered for me. That's the whole issue, is that they know something about the user that they can then disseminate to other people. That's the crux of the purpose of the statute. That's the second part of the statute, Your Honor. That's whether or not they have the ability to disclose a record that if they disclosed it, if they were subject to the statute in the first place, would violate it. That's the second part. That's only the second part. The record is the second part. The first part is whether or not they're one of the businesses that even fits under the statute, period. And that's where the district court rests its decision, and I think that's where we can go on a motion to dismiss and say Pandora just doesn't fit under the statute. This is what I was saying before. Lots of people can have records about what you listen to. Just the fact that they happen to have records about what you listen to doesn't put them under the statute. What's the counterpart of this in video? Is it Netflix or? What's the counterpart of Pandora for video? Yeah. There's not really a video service that's a counterpart. All of the services that appellant refers to are services where you get to pick a specific video and watch it for a specific period of time. This would be like watching, more like watching broadcast TV and seeing a channel of, you know, seeing a broadcast TV channel of things you don't pick but are probably things you're interested in. Not exactly. Not exactly. There's more customization. There is more customization, but I don't think it tips over into the realm of turning Pandora, who's a radio station, into a renter or lender, which leads to an important point, which is this finding that Pandora rents or lends because they put a temporary song file onto someone's computer has far-reaching effects. Buffering is how we deliver media. Those broadcast TV stations that we just talked about, when they stream over the Internet, they buffer. Everybody buffers. That's the way that we are delivering content now. Cable TV, satellite radio, Internet radio, more and more are doing it because it cuts out the gaps. In your old radio, if you drive and you're listening to AM radio and you go under a bridge, it cuts out. With buffering, if you're able to buffer radio and you have the same problem with your Internet service, it doesn't cut out. And so if Michigan didn't intend for something like a radio station to be covered by the statute in 1988, we shouldn't turn it into a renter or lender of a sound recording simply because it's this technical, temporary sound file gets stored on the computer. For that reason, Your Honor, you should affirm the district court's decision. Thank you, Mr. Sommer. Mr. Andrews? I'd like to make three, hopefully, brief points on reply. The first is to address counsel's DJ hypothetical. A DJ is completely distinct from what we're alleging Pandora does. We allege that Pandora gives an actual copy. With a DJ, the DJ is not giving you a copy, and it's not keeping a record. It's two completely different situations. Further, all this talk about buffering and ephemeral copies contradicts the allegations of the complaint. The allegations of the complaint are they provide a full song, and ephemeral is just another term that's borrowed by copyright that really shouldn't have any application here. Second, even though their brief doesn't really address the possession or return point, I'd like to talk about why that doesn't matter here briefly. As I think the Court may recognize, modern libraries, other things, find that providing a digital copy is basically equivalent to giving possession of something. And the cutting off of access to that file, the way a Kindle works or other things, is basically equivalent to the return. Have you had an opportunity to look at this Pandora case that was decided in New York recently? I did read through it, Your Honor. I think that it doesn't really, I think, affect anything here for a couple reasons. One, it's just more evidence of what the purpose of copyright is. It's to determine what a fair rate for the copyright holders is. That's what that case is about. And it does so by making a distinction between certain rights that the copyright holder has, as applied to the exact same delivery mechanism. They're both providing copies. The only reason that it breaks more towards the particular license that they're That's the break in copyright law. That's the purpose of copyright law. If you look at those decisions, those decisions articulate that that is how that law is supposed to be read on rate-setting cases. Further, that case is actually about Pandora's licenses well after the allegations of this complaint. It's a recent license, and how it's saying it worked and operated doesn't have anything to do with when this complaint was filed and when the alleged actions occurred. This all occurred in 2010. I believe that decision deals with 2011 and operations and later. Roberts. Thank you, Mr. Ramsey. Mr. Sumner. Thank you. Thank you as well. The case has started. It is submitted.
judges: Huck, Schroeder, Silverman